[Cite as *State v. Pressley*, 2012-Ohio-4083.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                    :

    Plaintiff-Appellee                          :          C.A. CASE NO.    24852

v.                                               :          T.C. NO.    10CR3727/2

JACK R. PRESSLEY                                 :          (Criminal appeal from
                                                           Common Pleas Court)

    Defendant-Appellant                         :

                                                 :

. . . . . . . . . .

**O P I N I O N**

Rendered on the     7th     day of     September     , 2012.

. . . . . . . . . .

MICHELE D. PHIPPS, Atty. Reg. No. 0069829, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

PETER R. CERTO, Atty. Reg. No. 0018880, One S. Main Street, Suite 1590, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

{¶ 1}     Defendant-appellant Jack R. Pressley appeals his conviction and sentence for burglary (occupied structure), in violation of R.C. 2911.12(A)(1), a felony of the second

degree, and one count of possession of criminal tools, in violation of R.C. 2923.24(A), a felony of the fifth degree. Pressley filed a timely notice of appeal with this Court on October 14, 2011.

{¶ 2} The basis for the instant appeal occurred on November 22, 2010, at approximately 2:00 p.m. when the victim, Erin Dues, was alone at home in the upstairs bathroom of her residence located at 4433 Jonathan Drive in Kettering, Ohio. Upon hearing her dogs begin barking, Dues stepped out of the bathroom and looked down at the front door where she observed a man she did not know knocking on her door. Dues testified that she could clearly see the man at her front door. Further, a large picture window to the left of the door afforded her a full view of the individual.

{¶ 3} The man continued to knock on the door and ring the doorbell while Dues studied his appearance. Dues, beginning to fear for her safety, called her neighbor, Jay Morgan, who lives across the street. Morgan's residence provides him a good view of Dues' residence and driveway. Dues informed Morgan that she did not know the man who was knocking on her door. Dues testified that she asked Morgan to come over.

{¶ 4} After approximately twenty to thirty seconds of knocking on the door, the man, later identified as Pressley's co-defendant, Drexil L. Adkins, left the front porch and walked around towards the back of the house as Dues continued to observe him. Dues testified that Adkins had dark hair and facial hair. Dues further testified that Adkins was wearing a white t-shirt and was walking with a cane. After she observed Adkins walk around the side of her house, Dues ended her conversation with Morgan and went to her bedroom with a portable telephone. From her bedroom window, Dues observed Adkins approach a

red four-door sedan with faded paint on the rear of the vehicle. Another man with red hair and a goatee exited the red sedan and spoke briefly with Adkins. Dues testified that the man with red hair, later identified as Pressley, had a tattoo on his face and was wearing a hooded gray sweatshirt. At this point, Dues called 911 at approximately 2:14 p.m.

{¶ 5} While she was speaking with the 911 operator, Dues observed Adkins and Pressley walk towards the back door of her residence which consists of a sliding glass door that leads into a sunroom which is connected to the next room by two additional glass doors. Dues testified that she was able to observe both men very closely as they approached the back door. Eventually, Dues lost sight of the two men, and the 911 operator told her to go into the bedroom and lock the door. While she was in the bedroom, Dues testified that she heard the sound of breaking glass followed by the sounds of muffled footsteps as if someone was shuffling through glass. After a few minutes passed, Dues testified that she heard someone in her house calling her name. Dues realized it was her neighbor and she called out to him. Morgan went upstairs and told Dues that he had just seen the red sedan drive away with four white males inside the vehicle. Dues relayed all of the information to the 911 operator and waited for the police to arrive.

{¶ 6} Officer John Soto of the Kettering Police Department responded to the dispatch regarding the burglary almost immediately. When Officer Soto received the call, he was just leaving the parking lot of the Kettering Police Department located on Shroyer Road which was close to Dues' residence. After consulting a map of the area, Officer Soto determined that the perpetrators would be leaving the area by one of only a few possible routes. Officer Soto positioned his cruiser at the intersection of Maricarr Drive and East

Stroop Road in Kettering. From this vantage point, Officer Soto testified that he was able to observe all vehicles traveling on Stroop Road in both directions. While he waited, Officer Soto observed a red sedan with "sunspots" on the trunk which he understood to be the same as faded paint. Officer Soto testified that he also noticed that there were four individuals in the vehicle and they were all sitting rigidly in their seats looking straight ahead. Officer Soto testified that he thought it was suspicious that no one in the vehicle looked in his direction or made eye contact with him. Officer Soto testified that he observed the vehicle at a distance of approximately two and one-half miles from Dues' residence.

{¶ 7} Officer Soto pulled onto Stroop Road and began following the red sedan. Officer Soto checked the license plates and discovered that the vehicle was registered to Tiffany MacIntosh. Officer Soto testified that the driver of the vehicle was not speeding, nor did she commit any traffic violations. Based on the matching description of the vehicle as well as the "suspicious" behavior of its occupants, Officer Soto stopped the vehicle at the corner of Shroyer Road and Schuyler Drive in Kettering at approximately 2:20 p.m. After other officers arrived, Officer Soto approached the vehicle and removed the driver, Tiffany MacIntosh, placing her in the back of his cruiser. The three remaining occupants of the vehicle were also removed from the vehicle, handcuffed, and ordered to stand against a fence next to the roadway. The men were flanked by plain clothes detectives and uniformed police officers on either side.

{¶ 8} While the men stood against the fence, Officer Steven Driscoll of the Kettering Police Department was dispatched to Dues' residence. Once he arrived, Officer

Driscoll spoke with Dues and Morgan regarding the details of the burglary. While at Dues' residence, Officer Driscoll received a report that Kettering Police had stopped a vehicle nearby which matched the description of the vehicle used in the burglary. At that point, it was decided that Officer Driscoll would conduct a drive-by with Dues in an effort to identify the possible suspects. Officer Driscoll placed Dues into an unmarked police vehicle and then drove to the area where the suspects were located.

{¶ 9} Dues subsequently identified both Pressley and Adkins as the two men who broke into her residence. Dues also identified the red sedan as the vehicle that the suspects used during the burglary. Upon being searched, several pieces of broken glass were found in Pressley's pockets. The police also discovered broken glass in the vehicle, as well as a glass punch. Pressley was arrested and charged with burglary of an occupied structure and possession of criminal tools.

{¶ 10} On December 28, 2010, Pressley was indicted for burglary and possession of criminal tools. At his arraignment on December 30, 2010, Pressley stood mute, and the trial court entered a plea of not guilty on his behalf. Pressley filed a motion to suppress on January 19, 2011, wherein he challenged the initial stop and subsequent search of the vehicle, as well as any incriminating statements that may have been made. After a hearing held on May 25, 2011, and June 16, 2011, the trial court overruled Pressley's motion to suppress orally during a pre-trial hearing on August 16, 2011. The trial court's ruling was journalized in an entry filed on August 17, 2011.

{¶ 11} A jury trial was held on August 29, 30, and 31, 2011, and Pressley was found guilty of both burglary and possession of criminal tools. On September 27, 2011, the

trial court sentenced Pressley to an aggregate term of seven years imprisonment.

{¶ 12}   It is from this judgment that Pressley now appeals.

{¶ 13}   Because they are interrelated, Pressley's first and second assignments of error will be discussed as follows:

{¶ 14}   "THE TRIAL COURT ERRED WHEN IT FOUND THAT THE ARRESTING OFFICER HAD [A] REASONABLE ARTICULABLE SUSPICION TO MAKE AN INVESTIGATORY STOP OF THE DEFENDANT/APPELLANT'S MOTOR VEHICLE."

{¶ 15}   "THE TRIAL COURT ERRED IN FINDING THERE WAS PROBABLE CAUSE FOR THE ARREST OF THE DEFENDANT."

{¶ 16}   In his first assignment, Pressley contends that the trial court erred when it overruled his motion to suppress because the police lacked a reasonable, articulable suspicion to stop the vehicle in which he was a passenger.   In his second assignment, Pressley argues that because Officer Soto lacked a reasonable suspicion to stop the red sedan, he was unlawfully placed under arrest at the time of the initial traffic stop.

{¶ 17}   In regards to a motion to suppress, "the trial court assumes the role of trier of facts and is in the best position to resolve questions of fact and evaluate the credibility of witnesses." *State v. Hopfer*, 112 Ohio App.3d 521, 679 N.E.2d 321 (2d Dist.1996),   quoting *State v. Venham*, 96 Ohio App.3d 649, 653, 645 N.E.2d 831 (4th Dist.1994).   The court of appeals must accept the trial court's findings of fact if they are supported by competent, credible evidence in the record. *State v. Isaac,* 2d Dist. Montgomery No. 20662, 2005-Ohio-3733, citing *State v. Retherford*, 93 Ohio App.3d 586, 639 N.E.2d 498 (2d

Dist.1994). Accepting those facts as true, the appellate court must then determine, as a matter of law and without deference to the trial court's legal conclusion, whether the applicable legal standard is satisfied. *Id.*

**{¶ 18}** The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution protect individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). A traffic stop by a law-enforcement officer must comply with the Fourth Amendment's reasonableness requirement. *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

**{¶ 19}** A police officer may stop and detain a motorist when he has a reasonable and articulable suspicion that a motorist has committed, is committing, or is about to commit any criminal offense, including a traffic offense, and no independent reasonable and articulable suspicion of other criminal activity is required under *Terry*. *State v. Stewart*, 2d Dist. Montgomery No. 19961, 2004-Ohio-1319, at ¶13; *Dayton v. Erickson*, 76 Ohio St.3d 3, 665 N.E.2d 1091 (1996). We determine the existence of reasonable suspicion by evaluating the totality of the circumstances, considering those circumstances "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Heard*, 2d Dist. Montgomery No. 19323, 2003-Ohio-1047.

**{¶ 20}** "[C]ourts still retain their traditional responsibility to guard against police conduct which is overbearing or harassing, or which trenches upon personal security without the objective evidentiary justification which the Constitution requires. When such conduct is identified, it must be condemned by the judiciary and its fruits must be excluded from

evidence in criminal trials." *State v. Studley*, 2d Dist. Greene No. 2010 CA 81, 2011-Ohio-5563, quoting *Terry*, 392 U.S. at 15.

{¶ 21} Initially, we note that after Officer Soto decided to follow the red sedan, he testified that he did not observe the driver of the vehicle commit any traffic violations, nor did he observe the four occupants of the vehicle make any furtive movements or gestures. In fact, Officer Soto testified that all of the occupants of the red sedan were sitting up and looking straight ahead. Officer Soto testified that none of the occupants looked in his direction, and he found their failure to acknowledge him to be suspicious behavior. A driver's failure to acknowledge or make eye contact with a police officer, in the absence of a traffic violation or suspicion of another criminal act, is not a valid reason to initiate a stop of a vehicle. See *State v. Lindsey*, 2d Dist. Montgomery No. 24943, 2012-Ohio-3105, ¶16.

{¶ 22} Nevertheless, on this record, we conclude that under the totality of the circumstances, Officer Soto possessed a reasonable, articulable suspicion to initiate a stop of the red sedan. Significantly, Officer Soto testified that he had just received a call that a burglary had been committed in the immediate area, and four individuals had left the crime scene in a red four-door sedan with faded paint on the rear of the vehicle. After he received the dispatch regarding the burglary, Officer Soto determined a probable route the suspects would take to leave the area. After positioning himself accordingly, Officer Soto observed a red four-door sedan with "sunspots" on the rear section drive by him. Officer Soto further testified that the vehicle had faded paint on the trunk. He further noted that there were four individuals in the vehicle. Accordingly, the description and location of the red sedan, coupled with the fact that there were four occupants therein, provided Officer Soto with a

reasonable, articulable suspicion to stop the vehicle.

{¶ 23} "Law enforcement officers may briefly stop and detain an individual for investigation if the officers have a reasonable, articulable suspicion that criminal activity may be afoot. That is something more than an unparticularized suspicion or mere hunch, but less than the level of suspicion required for probable cause. To satisfy that standard, police must be able to point to specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the intrusion." *State v. Studley*, 2d Dist. Greene No. 2010 CA 81, 2011-Ohio-5563, at ¶ 54. In the instant case, Officer Soto's testimony contained specific and articulable facts which reasonably warranted the detention of the four occupants of the vehicle as set forth above. In light of the evidence adduced at the suppression hearing, the police acted reasonably by briefly detaining Pressley and the other three occupants of the suspect vehicle in order to determine whether they were involved in the nearby burglary. Pressley was not placed under arrest until after the identification occurred.

{¶ 24} Pressley's first and second assignments of error are overruled.

{¶ 25} Pressley's third and final assignment of error is as follows:

{¶ 26} "THE TRIAL COURT ERRED IN NOT SUPPRESSING THE SHOW-UP IDENTIFICATION EVIDENCE IN VIOLATION OF APPELLANT'S DUE PROCESS RIGHTS UNDER ARTICLE I, SECTION 10 AND 16 OF THE OHIO CONSTITUTION, ORC 2933.83, AND THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION."

{¶ 27} In his final assignment, Pressley contends that the trial court erred when it

overruled his motion to suppress as it related to his on-scene identification by Erin Dues. Specifically, Pressley argues that the on-scene identification was inadmissible because it was the result of an "inherently suggestive" procedure and was, therefore, unreliable.

**{¶ 28}** "Show-ups at or near the scene of a crime, that occur shortly after the crime, are not only permissible, but useful, since they can lead to an identification or non-identification while the characteristics of the perpetrator are still fresh in the witness's memory. However, the show-up must not be unduly suggestive. The defendant bears the burden to prove that a show-up procedure was so suggestive of guilt that it requires suppression. (Internal citations omitted)." *State v. McCrary*, 2d Dist. Montgomery No. 23360, 2010-Ohio-2011. However, Pressley failed to meet this burden.

**{¶ 29}** Officer Driscoll transported Dues to the area where the suspects had been stopped and arrested within thirty minutes of the burglary at Dues' residence. Officer Driscoll testified that he informed Dues only that they were going to do a drive-by in order to determine whether she recognized anyone. Nothing more was said or disclosed to Dues prior to the on-scene identification. Once at the scene, Dues immediately recognized the red sedan used in the burglary. Dues also immediately identified Pressley and Adkins as the two men she observed in her backyard as the burglary occurred. Dues was very confident in her identification of Pressley and Adkins because she had the opportunity to view both men during the course of the burglary for a significant amount of time. Moreover, Dues viewed both men from an unobstructed vantage point. We also note that the burglary occurred during mid-afternoon on a bright, sunny day.

**{¶ 30}** Pressley points out that on a portion of the 911 tape, you can hear an

unknown individual say, "We got them. We got them," ostensibly in regards to the Kettering Police stopping and detaining the suspects in the red sedan. Pressley argues that Dues was on the phone with the 911 operator when this statement was made, and she may have, therefore, been predisposed to identifying Pressley and Adkins as the perpetrators before she reached the scene of the stop. The 911 tape, however, was played during the suppression hearing, and Dues testified specifically that she did not recall hearing the remark on the day of the burglary.

{¶ 31}   Upon review, we conclude that there is no indication from the record that the on-scene identification was improperly conducted. Dues was simply asked to look at the three males to see if she recognized any of them. Such a neutral statement to explain the procedure is not impermissibly suggestive of guilt. See, e.g., *State v. Carruth*, 2d Dist. Montgomery No. 19997, 2004-Ohio-2317, ¶16. There is no evidence that Dues felt forced to identify anyone or that the police officers were asking her to corroborate the officers' suspicion of guilt, either of which may make the process impermissibly suggestive. *Id*. Most importantly, Dues was able to distinguish between the men she could recognize from the burglary and the one she could not identify. We note that Pressley argues that the Kettering Police did not follow their own internal policies regarding the documentation of information with respect to show-up identifications. The issue before us, however, is whether the circumstances surrounding the show-up identification were unduly suggestive, thereby violating Pressley's due process rights. Accordingly, we find that the on-scene identification of Pressley was not unduly suggestive, and the trial court did not err in denying Pressley's motion to suppress Dues' identification testimony.

{¶ 32} Lastly, Pressley argues that the Kettering Police violated its internal policy regarding its procedure for conducting a physical line-up identification, as well as R.C. 2933.83, the State of Ohio's guidelines on line-up identifications. This assignment of error implicates R.C. 2933.83(B), which took effect in July 2010. *State v. Stevenson*, 2d Dist. Montgomery No. 24821, 2012-Ohio-3396. The statute "requires any law enforcement agency or criminal justice entity that conducts live lineups and photo lineups to adopt specific procedures for conducting the lineups." *State v. Ruff*, 1st Dist. Hamilton No. C-110250, 2012-Ohio-1910, ¶5. These procedures include, inter alia, using "a blind or blinded administrator" to conduct a physical live line-up or a photo lineup. R.C. 2933.83(B)(1). Under R.C. 2933.83(C)(1), evidence of a failure to comply with the required protocol "shall be considered by trial courts in adjudicating motions to suppress eyewitness identification resulting from or related to the lineup."

{¶ 33} Initially, we note that what occurred in the instant case was a show-up identification, not a stereotypical physical line-up identification conducted at a police station. The Kettering Police Department does not use physical line-ups pursuant to its written policy in G.O. 42.2.11(A)(2) which specifically states that "because of the cumbersome nature of physical line-ups and inadequate facilities to perform a physical line-up, KPD personnel will not put suspects in physical line-ups." Additionally, the procedures set forth in R.C. 2933.83 do not apply to the facts herein. R.C. 2933.83(A)(7) defines a "live lineup" as an "identification procedure in which a group of persons, including the suspected perpetrator of an offense and other persons not suspected of the offense, is displayed to an eyewitness for the purpose of determining whether the eyewitness identifies the suspect as

the perpetrator of the offense." No "persons not suspected of the offense" were included in the show-up identification of Pressley and his accomplices.

**{¶ 34}** Pressley's third and final assignment of error is overruled.

**{¶ 35}** All of Pressley's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . .

GRADY, P.J. and HALL, J., concur.

Copies mailed to:

Michele D. Phipps
Peter R. Certo
Hon. Gregory F. Singer